IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREW MILLER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>FIVERR, INC.,<br><br>Defendant. | Case No.: 25-2684 |

**COMPLAINT**

Plaintiff Andrew Miller, on behalf of himself and all others similarly situated, complains of Defendant Fiverr, Inc. as follows, on information and belief except as to his own experiences and matters of public record:

**INTRODUCTION**

1.      "Drip pricing" is the practice of listing one price for a good or service up front, then adding one or more hidden "junk fees" to the total price just before the consumer decides to complete the transaction.

2.      Drip pricing is a form of dishonest bait-and-switch advertising.

3.      For this reason, it is prohibited by New York, California, and federal consumer protection law.

4.      Fiverr, the owner and operator of an online freelancing platform, does just what the law prohibits. Over and over again, it lists one upfront price to entice consumers into making a purchasing decision, only to pull the rug out from under their feet at the last stage of the transaction by adding hidden, mandatory junk fees when consumers have already decided to complete the transaction in reliance on the upfront price.

5.      Plaintiff Andrew Miller purchased certain services on Fiverr, the price of which was misleadingly and unlawfully advertised as lower than the total price Miller would pay after Fiverr smuggled in its junk fees just as he was completing the transaction.

6.      On behalf of himself and all other similarly injured consumers, Plaintiff brings this action to put a stop to Fiverr's illegal business practices and to remedy the injuries they have caused.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and under § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

9.      Plaintiff Andrew Miller is a resident of Oakland, California.

10.      Defendant Fiverr, Inc. is a corporation incorporated in Delaware with its principal place of business at 26 Mercer St., New York, NY 10013.

## FACTUAL ALLEGATIONS

**I.      Drip pricing harms consumers.**

11.      "Hidden fees" refer to fees charged by sellers in consumer transactions that are

obscured from the consumer.[1] Hidden fees are a kind of "junk fees."[2] Such fees are "mandatory but not transparently disclosed to consumers."[3] Consumers may be "lured in with the promise of a low price, but when they get to the register, they discover that price was never really available."[4] Hidden junk fees are thus "an evolution of bait-and-switch schemes."[5]

12.    The practice of disclosing hidden or junk fees "late in the buying process" is often called "drip pricing."[6] Using drip pricing, "firms advertise only part of a product's total price to lure in consumers."[7] Then, once "the consumer already has spent significant time selecting and finalizing a product or service plan to purchase," the mandatory junk fees are disclosed.[8]

13.    As an example of drip pricing of junk fees, the FTC has pointed to "'convenience fee[s]' that appear[] only when a shopper reaches the check-out screen":[9]

---

[1] *See* Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 7 (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf/.

[2] Fed. Trade Comm'n, *FTC Proposes Rule to Ban Junk Fees* (Oct. 11, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees/ (discussing "hidden fees" as a "junk fee practice[]").

[3] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, The White House (March 5, 2024), https://web.archive.org/web/20250118015252/https://www.whitehouse.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/.

[4] *Id.*

[5] *Id.* n.2.

[6] *Bringing Dark Patterns to Light*, *supra* note 1, at 8–9.

[7] *Id.* at 8.

[8] *Id.* at 9.

[9] *Id.* at 23, 30.



14.     Consumers "feel committed to a purchase" at this stage of the transaction and thus go through with it anyway, despite feeling "frustrated" that "they have no idea how much it costs until it's too late."[10] "Even when consumers who have experienced drip pricing are aware of the total price and are given the option to change their selection, many do not, despite being dissatisfied."[11]

15.     "[S]everal psychological mechanisms" are responsible for drip pricing's effectiveness at influencing consumer behavior. Once a consumer has committed to a purchase, "abandoning it" in the face of drip-priced junk fees "may cause feelings of uncertainty, dissatisfaction and cognitive dissonance." Drip pricing practitioners may "rely on the extra effort that would be required" for consumers to back out of the transaction at its last step, "such that consumers accept the price increasing later in the purchase process."[12]

---

[10] *Id.* at 9.

[11] U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 29 (Apr. 2022), https://assets.publishing.service.gov.uk/media/624c27c68fa8f527710aaf58/Online_choice_archit ecture_discussion_paper.pdf/.

[12] *Id.* at 30.

16.    In turn, "[s]everal behavioural biases" drive these mechanisms, including "anchoring," or the tendency to "anchor on initial price information" without "fully adjust[ing]" one's "view of the price" once all mandatory fees are disclosed; the "sunk cost fallacy," or the tendency to "continue with a process if [consumers] have invested time or effort"; and the "endowment effect," or the tendency to "place a higher value on objects [consumers] own, or have imagined owning."[13]

17.    Drip pricing harms consumers.

18.    "Junk fees cost American families tens of billions of dollars each year and inhibit competition, hurting consumers, workers, small businesses, and entrepreneurs."[14]

19.    "Drip pricing has been shown in several experimental, theoretical and real-world contexts to lead consumers to buy more, overspend, underestimate the total price, make mistakes when searching, and be less happy with their purchases."[15]

20.    "Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction."[16]

21.    According to one study, consumers who were not shown full prices, including mandatory fees, at the beginning of a transaction "ended up spending about 20% more money and were 14% more likely to complete [it]" than consumers to whom junk fees were disclosed up

---

[13] *Id.*

[14] The White House, *Biden-Harris Administration Announces Broad New Actions to Protect Consumers From Billions in Junk Fees* (Oct. 11, 2023), https://web.archive.org/web/20250118020934/https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/11/biden-harris-administration-announces-broad-new-actions-to-protect-consumers-from-billions-in-junk-fees/.

[15] *Online Choice Architecture*, *supra* note 11, at 30.

[16] *Bringing Dark Patterns to Light*, *supra* note 1, at 9.

front.[17]

22.    Drip pricing thus causes consumers to "spend more than they intend, choose unsuitable products and waste their time."[18]

23.    Drip pricing harms honest businesses too.

24.    An "honest business that sets forth the total price of its product at the outset will be at a significant disadvantage when compared to a seller that advertises an artificially low price to draw consumers in, then adds mandatory charges late in the transaction."[19]

25.    Drip pricing thereby harms free and fair competition.

26.    "Since consumers are more likely to choose products based on characteristics they find most salient, businesses will tend to compete harder on those characteristics and less hard on less salient characteristics." Mandatory fees disclosed only at the final stages of a transaction are definitionally "less salient" than up-front prices, and therefore generate "little to no competition."[20]

27.    For this reason, drip pricing is difficult or impossible to correct using only market pressures.[21]

28.    The law must intervene.[22]

## II.    State and federal consumer protection laws protect consumers against drip pricing.

29.    New York law prohibits "[d]eceptive acts or practices in the conduct of any

---

[17] *Id.*

[18] *Online Choice Architecture*, *supra* note 11, at 30.

[19] *Bringing Dark Patterns to Light*, *supra* note 1, at 9.

[20] *Online Choice Architecture*, *supra* note 11, at 30.

[21] *See id.* at 31 ("Where there are enough consumers who do not detect and avoid drip pricing, competitive pressures may also not be sufficient to incentivise businesses to educate or provide more upfront price information to consumers.").

[22] *See id.* (discussing regulatory interventions).

business,"[23] including "[f]alse advertising."[24]

30.    For more than 65 years, New York has held bait-and-switch schemes like drip pricing to be "deceptive and harmful to the public interest."[25]

31.    More recently, the sponsor of a bill regulating event ticket sales, which, among other things, prohibited drip pricing, noted the bill incorporated recommendations generated by a legislative investigation into the ticketing industry "due to concerns about potentially unfair, deceptive, and anti-consumer practices."[26]

32.    California law likewise prohibits drip advertising.

33.    "[T]he price a Californian sees should be the price they pay."[27] This straightforward, commonsense proposition underlies California Senate Bill 478, effective July 1, 2024, codified at Cal. Civ. Code § 1770(a)(29), called the "Honest Pricing Law" or "Hidden Fees Statute."

34.    The Honest Pricing Law was enacted to suppress the dishonest bait-and-switch of drip pricing. The Legislature declared that SB 478 is "intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service,"[28] and identified drip pricing as a form of "bait and switch advertising."[29]

---

[23] N.Y. Gen. Bus. Law § 349(a).

[24] *Id.* § 350.

[25] *Electrolux Corp. v. Val-Worth, Inc.*, 161 N.E.2d 197, 204 (N.Y. 1959).

[26] S.B. 9461-244, Sponsors Mem. (N.Y. 2022). The enacted bill amended several sections of the New York Arts and Cultural Affairs Law. *See* 2022 N.Y. Sess. Laws ch. 358 (McKinney). The drip pricing provision is codified at N.Y. Arts & Cult. Aff. § 25.07(4).

[27] Cal. Dep't of Justice Off. of the Att'y Gen., *SB 478 Frequently Asked Questions* 1 (emphasis omitted), https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf/ (last accessed Mar. 31, 2025).

[28] S.B. 478, 2023–2024 Leg. § 1(a) (Cal. 2023).

[29] *Id.* § 1(b).

35.    As the California Attorney General has summarized succinctly, "The law requires honest pricing. It prohibits businesses from '[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges' other than government-imposed taxes or fees or reasonable shipping costs."[30]

36.    "Honest pricing" means not just that junk fees are disclosed at some point in the transaction. "Can a business comply with this law by disclosing additional required fees before a consumer finalizes a transaction? No. The advertised or listed price must be the full price that the consumer is required to pay. … If a business chooses to list a price for a good or service, the advertised price must be the entire amount the consumer will have to pay, not including any fees for optional services or features, taxes, or shipping charges."[31]

37.    Further, "like other forms of bait and switch advertising," drip pricing is "prohibited by existing [California] statutes, including the Unfair Competition Law (Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code) and the False Advertising Law (Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code)."[32]

38.    Federal law likewise prohibits dishonest bait-and-switch advertising like drip pricing. Section 5(a) of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."[33]

39.    The FTC has brought enforcement actions against drip pricing practices for

---

[30] Cal. Dep't of Justice Off. of the Att'y Gen., *supra* note 1, at 1 (quoting Cal. Civ. Code § 1770(a)(29)(A)).

[31] *Id*. at 2–3.

[32] S.B. 478, 2023–2024 Leg. § 1(b) (Cal. 2023).

[33] 15 U.S.C. § 45(a).

violating Section 5(a). For example, in *Federal Trade Commission v. Liberty Chevrolet, Inc.*, the agency alleged among other things that a car dealership advertised "vehicles for sale at a specific price but then fail[ed] to honor those prices."[34] The dealership falsely represented that consumers could purchase cars for advertised prices that "failed to include an additional certification fee."[35] Consumers would invariably find that the advertised car could "only be purchased for a higher price" that included the fee.[36] The dealership thereby "charge[d] consumers higher sales prices than advertised"[37] in violation of Section 5(a).[38]

40.     The FTC has also warned businesses that drip pricing invites Section 5(a) enforcement. For example, the agency has warned hotel operators that failure to disclose mandatory fees up front "may violate the law by misrepresenting the price consumers can expect to pay for their hotel rooms."[39]

## III.     Fiverr's platform dishonestly baits consumers using drip pricing.

41.     Fiverr is an online platform that offers freelancing services to consumers.

42.     Like other businesses—such as Door Dash, Lyft, or Airbnb—that connect

---

[34] Compl. ¶ 10, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF No. 7.

[35] *Id.* ¶ 11.

[36] *Id.*

[37] *Id.*

[38] *Id.* ¶¶ 35–37. The case settled for $1,500,000 in consumer refunds and permanent injunctive relief. *See Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF Nos. 15–16.

[39] Fed. Trade Comm'n, *Model Warning Letter* 1 (Nov. 2012), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/121128hoteloperatorsletter.pdf/; *see* Fed. Trade Comm'n, *FTC Warns Hotel Operators that Price Quotes that Exclude 'Resort Fees' and Other Mandatory Surcharges May Be Deceptive* (Nov. 28, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/11/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/.

consumers to service providers, Fiverr's platform connects freelancers with consumers who need freelancing services.

43.    For example, the founder of a hiking club who wanted a logo for the club could go on Fiverr's website and see an offer for logo creation priced at $40:



44.    Fiverr's platform prominently displays the qualifications, accomplishments, and consumer reviews of each freelancer, so that consumers are likely to invest considerable time researching and selecting the freelancer of their choice before clicking "Continue":





What people loved about this freelancer                    See all reviews

45.     Beneath this material, the $40 purchase price is advertised again under the heading "About this gig":

## About this gig

Hi,
Do you need a **Quality Logo Creation** in just 12 hours?
If yes, stop looking for other gigs because, in this high-quality logo creation gig, we design **modern, flat, unique, professional, Minimalist Luxury, and Creative Business Logo**.

With **4,000+ projects** completed, we are the perfect choice to deliver **2 modern Logo Design concepts for your business in 12 hours for just $40 with unlimited revisions.**

46.     Clicking the "Continue" button pictured above leads to another screen twice listing a $40 price:

11



47.    The $40 price is listed *again* on this page's "Continue" button:



48.    So much for the bait. Now the switch.

49.    Only now—after seeing a $40 price listed no fewer than *five times*, and likely after investing significant time in selecting the freelancer and service of her choice—is the full price of the transaction revealed to the consumer:



50.     A junk "service fee" of $5.20, amounting to 13 percent of the listed $40 price, has been added to the consumer's total at the final step of the transaction.

**IV.     Plaintiff is a victim of Fiverr's deceptive drip pricing practices.**

51.     Plaintiff Andrew Miller purchased freelance services on Fiverr's platform on January 6, 2025.

52.     Miller sought professional website development services.

53.     After investing significant time selecting the freelancer and service of his choice, Miller selected a service listed at $80.

54.     After completing the steps described above, Miller was confronted with a junk $5.75 "service fee," amounting to 7 percent of the listed price.

55.     Having already committed to it, Miller completed the transaction and paid $85.75

total, including the $5.75 junk fee:



56.    Miller believed that the initially listed $80 price would be the actual price he would

pay. In other words, Miller believed the $80 price included all mandatory fees (excluding taxes

and shipping charges, which did not apply here).

57.    Miller relied on the listed $80 price in comparing the service he purchased to other

available services, and in his initial purchasing decision.

58.    Because Fiverr's junk fee is variable and disclosed at the last step of the transaction,

Miller was unable to compare the costs of using Fiverr's platform with the costs of using other

platforms or service providers.

59.    Miller would have made a different decision had he known that the price was in

fact $85.75, rather than the listed $80 price.

60.    Miller intends to use Fiverr to purchase other freelancing services in the future.

## CLASS ALLEGATIONS

61.    Plaintiff brings this action under Federal Rule of Civil Procedure 23, on behalf of himself and all others similarly situated.

62.    Subject to future amendment or revision, Plaintiff seeks to represent the following putative class ("Nationwide Class"):

> All United States residents who purchased freelancing services on
>
> Fiverr's platform on or after July 1, 2024.

63.    Subject to future amendment or revision, Plaintiff also seeks to represent the following putative subclass ("California Subclass") of the Nationwide Class:

> All California residents who purchased freelancing services on
>
> Fiverr's platform on or after July 1, 2024.

64.    Excluded from the Nationwide Class and California Subclass are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

65.    The Nationwide Class and California Subclass are so numerous that joinder of all of their members is impracticable, as Plaintiff estimates their numbers to be in the thousands.

66.    There are questions of law and fact common to the Nationwide Class and California Subclass, including without limitation (a) whether Defendant has charged hidden junk fees through drip pricing; (b) whether Defendant's conduct violates the General Business Law, the Honest Pricing Law, or the FTC Act; (c) whether Defendant's conduct was unfair or objectively misleading; (d) whether Defendant has been unjustly enriched by its violation of Plaintiff's rights; and (e) whether Defendant should be enjoined from charging hidden junk fees through drip pricing.

67.    Plaintiff's claims are typical of the Nationwide Class's and California Subclass's claims. Plaintiff and Nationwide Class and California Subclass members share the same state and federal rights, which Defendant has injured in the same way by charging illegal junk fees through drip pricing.

68.    Plaintiff will fairly and adequately protect the Nationwide Class's and California Subclass's interests, as Plaintiff shares their interest in avoiding illegal drip pricing; has no interest adverse to them; and has retained competent counsel experienced in consumer protection and class action litigation.

69.    By charging hidden junk fees through drip pricing on each transaction, Defendant has acted on grounds that apply generally to Plaintiff and the Nationwide Class and California Subclass.

70.    The questions of law and fact common to Plaintiff and the Nationwide Class and California Subclass predominate over any individualized questions because, among other reasons, Defendant has violated their rights under the same laws by the same conduct.

71.    A class action is superior to other available methods for adjudicating this controversy because, among other reasons, the claims at issue may be too small to justify individual litigation.

## CLAIMS TO RELIEF

### COUNT I
### Violation of the N.Y. General Business Law §§ 349–350
### On behalf of the Nationwide Class

72.    Plaintiff realleges paragraphs 1–60 above.

73.    Defendant's drip pricing was consumer-oriented.

74.    Defendant's drip pricing was materially deceptive and misleading. Defendant's drip pricing was likely to mislead a reasonable consumer acting reasonably under the circumstances

into believing that freelancing services could be purchased on Defendant's platform for the prices Defendant advertises. Defendant's drip pricing advertises freelancing services at one price but charges consumers a different, higher price. The services advertised on Defendant's platform can only be purchased for a price higher than the one Defendant advertises. Defendant thus charges consumers higher prices than it advertises.

75.     Plaintiff has been injured as a result of Defendant's drip pricing. Among other things, as a result of Defendant's drip pricing, Plaintiff (1) was lured into using Defendant's platform by misleadingly low advertised prices; (2) was deprived of their ability to compare prices among freelancers on Defendant's platform, and between freelancers on Defendant's platform and other service providers; (3) was made to invest time and effort into selecting and finalizing a purchase without knowing how much the purchase would cost; and (4) faced higher prices on Defendant's platform and from other sellers than they would have absent Defendant's drip pricing, because honest sellers cannot fairly compete with Defendant's misleadingly low prices and because Defendant's deceptive drip pricing stifles competition on mandatory fees.

76.     For Defendant's violation of the General Business Law, Plaintiff seeks an injunction against Defendant's illegal drip pricing, as well as actual damages or $50, whichever is greater, trebled.

77.     Defendant's drip pricing was a willful or knowing violation of the General Business Law because it was the result of intentional design choices intended to bait consumers.

### COUNT II
### Violation of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750–1784
### On behalf of the California Subclass

78.     Plaintiff realleges paragraphs 1–60 above.

79.     Section 1770(a)(29)(A) of the California Civil Code prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or

charges" other than "[t]axes or fees imposed by a government on the transaction" or "[p]ostage or carriage charges that will be reasonably and actually incurred to ship the physical good to the consumer."

80.    Defendant violated Cal. Civ. Code § 1770(a)(29)(A) by omitting its junk "service fees" from the prices listed on its platform until the last step of the transaction.

81.    As a result of Defendant's violation, Plaintiff suffered damage by spending time and money he would not have spent but for Defendant's misleading drip pricing.

82.    For Defendant's violation of the Consumers Legal Remedies Act, Plaintiff seeks an injunction against Defendant's illegal drip pricing.

83.    On April 1, 2025, in accordance with Cal. Civ. Code § 1782(a), Plaintiff sent to Defendant by certified mail, return receipt requested, a notice of the violations alleged in this Complaint and a demand that Defendant correct and rectify its services accordingly.

84.    If Defendant does not agree to make an appropriate correction within 30 days after receipt of this notice and demand, Plaintiff will amend this claim to relief to seek damages, in accordance with Cal. Civ. Code § 1782(a).

### COUNT III
### Violation of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500–17606
### On behalf of the California Subclass

85.    Plaintiff realleges paragraphs 1–60 above.

86.    Section 17500 of the California Business and Professions Code provides that it is unlawful to make, disseminate, or cause the dissemination of advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

87.    Defendant violated Cal. Bus. & Prof. Code § 17500 by misleadingly advertising an

18

upfront price that was lower than the total price—including hidden junk fees—it would ultimately charge.

88.     As a result of Defendant's violation, Plaintiff has suffered injury in fact and lost money by spending time and money he would not have spent but for Defendant's misleading drip pricing.

89.     For Defendant's violation of the False Advertising Law, Plaintiff seeks an injunction against Defendant's illegal drip pricing, as well as restitution.

**COUNT IV**
**Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210**
**On behalf of the California Subclass**

90.     Plaintiff realleges paragraphs 1–60 above.

91.     Section 17200 of the California Business and Professions Code prohibits unfair competition by means of "any unlawful, unfair or fraudulent business act or practice," including by violations of the False Advertising Law.

92.     Defendant violated Cal. Bus. & Prof. Code § 17200 by (a) unlawfully engaging in drip pricing, in violation of the Consumers Legal Remedies Act, the False Advertising Law, and Section 5(a) of the FTC Act; (b) unfairly engaging in unethical bait and switch advertising that injures consumers and benefits no one but Defendant, and violates the legislatively declared policy of price transparency; and (c) fraudulently advertising an upfront price that was lower than the total price—including hidden junk fees—it would ultimately charge.

93.     As a result of Defendant's violation, Plaintiff has suffered injury in fact and lost money by spending time and money he would not have spent but for Defendant's misleading drip pricing.

94.     For Defendant's violation of the Unfair Competition Law, Plaintiff seeks an

injunction against Defendant's illegal drip pricing, as well as restitution.

**COUNT V**
**Unjust Enrichment, New York and California Common Law**
**On behalf of the Nationwide Class and California Subclass**

95.     Plaintiff realleges paragraphs 1–60 above.

96.     Defendant received a benefit at Plaintiff's expense when Plaintiff paid the junk "service fee" Defendant charged.

97.     Defendant has unjustly retained the benefit Plaintiff conferred on it because Defendant procured the benefit through unlawful and misleading drip pricing, as well as through the oppressive psychological mechanisms on which drip pricing depends.

98.     For Defendant's unjust enrichment, Plaintiff seeks restitution of the benefits he paid and Defendant unjustly retained.

**PRAYER FOR RELIEF**

99.     Plaintiff asks the Court to

a.     Certify this action as a class action under Federal Rule of Civil Procedure 23, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

b.     Enter a final judgment in Plaintiff's and the Nationwide Class's and California Subclass's favor that

i.     Permanently enjoins Defendant from the unlawful conduct alleged in this Complaint,

ii.     Awards treble actual or statutory damages to Plaintiff and the Nationwide Class, according to proof;

iii.     Awards restitution to Plaintiff and the California Subclass, according to proof, and

           iv.      Awards pre- and postjudgment interest, as allowed by law;

100.    Award Plaintiff and his counsel their reasonable costs and fees incurred in prosecuting this action, as allowed by law;

101.    Order such further relief as the Court deems appropriate.

## JURY DEMAND

102.    Plaintiff demands a trial by jury on all issues so triable.

Dated: April 1, 2025

/s/ James J. Bilsborrow

James J. Bilsborrow (JB8204)
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
Tel.: (212) 558-5500
jbilsborrow@weitzlux.com

Lynn A. Toops*
Ian R. Bensberg*
**COHENMALAD, LLP**
One Indiana Square
Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
Fax: (317) 636-2593
ltoops@cohenmalad.com
ibensberg@cohenmalad.com

Samuel J. Strauss*
Raina C. Borrelli*
**STRAUSS BORRELLI, PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel.: (872) 263-1100
Fax: (872) 263-1100
sam@straussborellli.com
raina@straussborrelli.com

Gerard J. Stranch, IV*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
gstranch@stranchlaw.com

*Attorneys for Plaintiff and the Proposed Classes*

\*Application for admission *pro hac vice* forthcoming